Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

**KARPF, KARPF, CERUTTI, P.C.**
By: Ari R. Karpf, Esquire
Attorney I.D. No.: 91538
3331 Street Road
Two Greenwood, Suite
Bensalem, PA 19020
(215) 639-0801

| | |
|---|---|
| WANDA BROWN<br>71-2 Holly Dr.<br>Reading, Pa. 19606<br><br>         Plaintiff,<br>v.<br><br>BERKS COUNTY HOUSING<br>AUTHORITY<br>1803 Butter Ln.<br>Reading, PA 19606 ·<br><br>         Defendant. | COURT OF COMMON PLEAS<br>COUNTY OF BERKS<br><br>CIVIL ACTION<br><br>DOCKET NO.:<br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

1. Plaintiff, Wanda Brown (*hereinafter* referred to as "Plaintiff" unless otherwise indicated), hereby complains as follows against Berks County Housing Authority (*hereinafter* referred to as "Defendant") for violations of the Pennsylvania Whistleblower Act - 43 P.S. §§ 1421-1431, Pennsylvania common law, and the anti-relation provision of the False Claims Act ("FCA" – 31 U.S.C. § 3730(h)). Plaintiff asserts herein that she was unlawfully terminated from Defendant and has suffered damages as sought herein.

1

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

## VENUE

2. Venue is properly laid in the County of Berks pursuant to Rule 1006(a) of the Pennsylvania Rules of Civil Procedure because the transactions and occurrences from which the instant action arises occurred in that county.

## II. PARTIES

3. The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

4. Plaintiff is an adult individual residing at the above-captioned address.

5. Defendant is a governmental Public Housing Agency created and organized under the laws of Pennsylvania and primarily funded by the U.S. Department of Housing and Urban Development ("HUD").

6. At all times relevant herein, Defendant acted by and through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## III. FACTUAL BACKGROUND

7. The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

8. Plaintiff started working for Defendant as a Comptroller on or about May 10, 2021.

9. Defendant is a governmental Public Housing Agency created and organized under the laws of Pennsylvania and primarily funded by HUD.

10. During her employment with Defendant, Plaintiff performed her job well, was not

2

subjected to any discipline and was a very hard-working employee.

11.     Throughout her short tenure with Defendant, Plaintiff was primarily supervised by Executive Director – Tanya Nelson (hereinafter "Nelson"). Also involved in Plaintiff's employment and providing indirect supervision was Gwen Didden (Deputy Director – hereinafter "Didden")

12.     When Plaintiff was first hired, she was informed that management did not want the former controller or Defendants Fee Accountant to train her. Instead, Defendant told Plaintiff that a third-party trainer from Nan McKay and Associates, Inc. (hereinafter "Nan McKay") would be responsible for training her.

13.     This third-party trainer did not physically come to the facility until approximately June 3, 2021 (discussed further *infra*).

14.     Prior to June 3, 2021, Plaintiff directed the majority of her questions to Defendant's Fee Accountant, Jack Blosky (hereinafter "Blosky"), Didden, and Nelson.

15.     Shortly after being hired by Defendant, Plaintiff was approached by another employee, Mary Weaver (hereinafter "Weaver"), who provided Plaintiff with a manila folder which contained various documents.

16.     When Plaintiff reviewed the manila folder, she found multiple invoices for purchases made by Defendant that seemed to be questionable and as a result submitted some questions (related to the aforesaid documents) by email to an individual at Nan McKay.

17.     Plaintiff also approached Didden and asked what she was supposed to do with the aforesaid manila folder. Didden did not respond, so she inquired about the same with Nelson, who took the folder, but did not say much about the documents that were inside.

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

18. After providing the manila folder to Nelson and sending an email with questions pertaining to the invoices found within the manila folder to Nan McKay, Plaintiff was instructed by Nelson to not read any materials for the first six months. This instruction seemed very odd to Plaintiff, as she needed to understand policies, rules, and regulations that Defendant was required to follow in order to perform her job properly.

19. Unfortunately, the documents contained in the aforesaid manila folder were just the beginning of the suspicious acts and practices Plaintiff discovered while employed with Defendant.

20. In fact, from the outset of Plaintiff's employment through the time of her unlawful termination on or about June 18, 2021 (discussed further *supra*), Plaintiff discovered several instances of past and present actions/practices of Defendant that she reasonably believed were illegal, fraudulent, and violations of state and federal laws and regulations.

21. For example, but not intending to be an exhaustive list:

   a. Defendant receives capital funding from the federal government for larger improvement projects. It was Plaintiff's understanding that in order to receive these funds, Defendant would have had to submit a budget plan to the federal government and upon approval of the budget plan, the requested funds would be dispersed. It was also Plaintiff's understanding that these funds were required to be used solely for those items in the budget plan. Shortly after beginning her employment with Defendant, Plaintiff discovered unprofessional invoices (with fluctuating amounts) for floor tiles related to one of the properties falling under Defendant's

4

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

oversight and management. The invoices for the aforesaid tiles were charged to Defendant's capital funding account. During a meeting with Blosky and Nelson, Plaintiff inquired whether the tiles were in the capital funding budget, to which Blosky responded that they were not. Plaintiff then expressed concerns that Defendant was paying for improvements out of a capital funds which were <u>not</u> part of the approved capital fund budget. Blosky dismissed Plaintiff's concern and said that all he needed to do was a small revision to the capital fund budget. However, it was Plaintiff's understanding that the budget needed to be revised before actually spending the funds (as the revision would need to be approved by the federal government) and therefore Defendant's aforesaid actions was a misuse of federal funds.

b. In or about mid-May of 2021, Plaintiff noticed that the Defendant had a negative account balance in March of 2021 and asked Blosky why this occurred. Blosky informed Plaintiff that Defendant wrote checks to vendors when it knew that they did not have sufficient funds in the account at issue. Plaintiff responded to Blosky and stated that what Defendant had done is considered "check kiting" and is illegal. Blosky replied stating, "Yeah, but we knew HUD money was coming in."

c. In or about mid-May of 2021, Plaintiff was given a packet of checks to void that were dated for March of 2021; however, a lot these checks did not match the respective bank accounts and a large amount of the check

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

numbers were incorrect when reviewed with the corresponding bank statements. As a result, Plaintiff became concerned that the bank reconciliations for March of 2021 (which had already been completed) were fraudulent and contained false information, as it would have been impossible to reconcile a bank account in March of 2021 if Plaintiff was just given checks dated for March of 2021 to void in May of 2021. False or fraudulent bank reconciliations led Plaintiff to reasonably believe that Defendant's financial statements were also false and/or fraudulent.

d. Based on a review of Defendant's records, Plaintiff believed that Defendant had used federal funds to pay for new washers and dryers at certain public housing developments. Plaintiff observed that (1) these purchases were not properly included on Defendant's financial statements; (2) the money being collected from the washers and dryers was not being properly recorded on Defendant's financial statements; and (3) Defendant was collecting quarters from these machines and depositing them into a so-called property management account, but then was spending said funds on Amazon gift cards, lunches, and cell phones (among other items which could not reasonably be viewed as "property management");

e. Defendant has multiple banks accounts/funds designated for certain expenses related to public housing and property management. In or about the end of May, 2021, Plaintiff grew concerned that Defendant was commingling funds and committing fraud by (1) taking funds from one

6

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

account to pay for expenses associated with another; (2) paying employees based on a percentage of the work they performed under each account – even though the percentages were not accurate; and (3) taking funds from so-called property management accounts and spending them on personal items;

f.  Plaintiff observed that property management funds could not be traced on Defendant's financial statements and no one could explain to her where the revenue for property management was being recorded; and

g.  Inventory was not listed of Defendant's financial statements and when Plaintiff asked how inventory was being recorded – no one could provide her with answers.

22. Throughout May of 2021, Plaintiff expressed concerns to Defendants' management and Blosky about what she reasonably believed to be fraud and other illegal/criminal actions, including but not limited to:

i.  Fraudulent recordings of Defendant's financial statements – which, upon information and belief, would ultimately be submitted or used for submissions or reports to HUD for review, including but not limited for the purpose of distributing funding and/or assessing and scoring the performance of Defendant's projects under the Public Housing Assessment System (which Defendant could be sanctioned under under if it scored too low);

ii. Misuse of government (primarily federal) funds;

7

      iii. Commingling of funds; and

      iv. Check kiting.

23. Plaintiff's concerns were ignored and she was given a variety of excuses as to why Defendant's actions were not fraudulent or in violation of Pennsylvania or federal law/regulations.

24. In addition to expressing her concerns of illegal and fraudulent practices, Plaintiff also refused (when asked by Nelson) to have her name be placed on Defendant's bank accounts or be a signer for Defendant's bank accounts.

25. Because Plaintiff's aforesaid reports, objections, and complaints were dismissed by Defendant's management, she addressed some of the same concerns (pertaining to fraud and illegal activities) with the third-party trainer from Nan McKay, Mike Petro (hereinafter "Petro") during his visit on June 3, 2021.

26. Petro indicated that Plaintiff was expressing valid concerns and had asked good questions to Defendant's management.

27. In fact, during a meeting with Nelson, Plaintiff, and Petro on June 3, 2021, Petro had reiterated some of Plaintiff's concerns to Defendant's management, including being unable to track property management funds on Defendant's financial statements.

28. Petro was supposed to return to Defendant on June 28, 2021 in order to continue his second day of training with Plaintiff. However, Plaintiff was informed by Defendant on or about June 15, 2021 that Petro declined to return for a second day of training and stated that he did not want to be compensated for any time that he spent training Plaintiff of June 3, 2021

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

(presumably because he did not want to be held accountable for any fraudulent practices Defendant was promoting, condoning or instituting).

29. On or about June 17, 2021, Plaintiff was called into a conference room with Didden and Nelson. During this meeting, Didden stated to Plaintiff "now that you have seen all this illegal and fraudulent stuff, are you ready to quit?" Plaintiff was taken off guard by Didden's question and responded that she would not be quitting.

30. After Plaintiff informed Didden and Nelson that she would not be quitting, Didden the asked Nelson if she [Nelson] still wanted Plaintiff to work at Defendant, to which Nelson replied that she would need to "process this."

31. Less than 24 hours later, on or about June 18, 2021, Plaintiff was abruptly terminated from her employment with Defendant without any prior warning.

32. Plaintiff was informed that she was being terminated from Defendant because she was "incompetent." However, Defendant never provided her with any written or verbal discipline regarding her performance and failed to provide her with any logical explanation as to why Defendant deemed her "incompetent" to perform the job she was hired for.

33. Based on the foregoing, Plaintiff believes and avers that that she was really terminated for expressing concerns, reporting, and/or refusing to remain complicit or participate in Defendant's (1) illegal activities; (2) misuse of federal government funds; (3) fraudulent activities; and (4) wrongdoings.

## Count I
## Violations of the Pennsylvania Whistleblower Act ("PWA")
### (43 Pa. C.S.A. §§ 1421-1431 *et seq.*)

34. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

35. Defendant is a "public body" for purposes of the PWA.

36. The PWA makes it unlawful for a public employer to "discharge, threaten or otherwise discriminate or retaliate against an employee ... because the employee or a person acting on behalf of the employee makes a good faith report ... to the employer or appropriate authority an instance of wrongdoing or waste."

37. While working for Defendant, Plaintiff reported what she reasonably believed to be violations of state and federal law and regulations, including criminal activity on behalf of Defendant. For example (but not intended to be an exhaustive list):

   a. 18 U.S. Code §1001 – Statements or entries generally
   
   b. 18 U.S.C. § 371 – Conspiracy to commit offence or defraud an Entity of the United States;
   
   c. 31 U.S. Code § 3729 – False Claims;
   
   d. 24 CFR §§ 902, 903, and 905 – HUD regulations; and
   
   e. 18 Pa. C.S.A. § 1405 – Bad checks.

38. Following Plaintiff's complaints regarding what she reasonably believed to be violations of state and federal law and regulations, Plaintiff was directly asked by Gidden if she wanted to quit after discovering Defendant's "illegal" and "fraudulent" practices.

10

39. When Plaintiff informed Gidden that she was not going to quit, Defendant terminated Plaintiff's employment the very next day for completely pretextual reasons.

40. These actions (discussed *supra*) constitute violations of the PWA.

41. As a consequence of Defendant's violations of the PWA, Plaintiff has suffered damages.

## Count II
## Violations of Pennsylvania Common Law
### (Wrongful Discharge)

42. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

43. It is clearly prohibited in this Commonwealth to terminate an employee for refusing to commit or conspire to commit criminal acts. *See. e.g. Levito v. Hussman Food Service Co. Victory Refrigeration Div.*, WL 1426 (E.D. Pa. 1990); *Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699, 702 (3rd Cir.1988); *Shaw v. Russel Trucking Line, Inc.*, 542 F.Supp. 776 (W.D.Pa.1982); *Dugan v. Bell Tel. of Pennsylvania*, 876 F.Supp. 713, 725 (W.D.Pa.1990).

44. As a Controller at Defendant, Plaintiff had knowledge that Defendant was committing fraud or committing other criminal acts.

45. While Plaintiff reported this issue to Defendant's management, they ignored her concerns and instead wanted her to be complicit with and participate in such actions of fraud, including but not limited to allowing Defendant to put her name on their various bank accounts, which Plaintiff refused to do.

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

46. As a Controller aware of the fraudulent actions taking by Defendant, Plaintiff could have be held criminally liable for conspiring to commit a crime if she remained complicit with Defendants' acts of fraud under various state and federal laws, including but not limited to:

    a. Conspiracy to commit offence or defraud an Entity of the United States – 18 U.S.C. § 371; and

    b. Criminal Conspiracy - 18 Pa. C.S.A. § 903.

47. Therefore, Plaintiff refused to commit or conspire to commit a crime and instead continued to report Defendant's aforesaid fraud and illegal/criminal activities to Defendant's management, the outside training company hired to train Plaintiff in her role, and Defendant's Fee Accountant until she was ultimately terminated from her employment with Defendant.

48. It is believed and therefore averred that Plaintiff was terminated for her refusal to engage in and/or conspire to commit criminal acts at the direction of Defendant's management.

49. Defendant's termination of Plaintiff therefore constitutes a violation of this Commonwealth's common law protections.

## Count III
## Violations the False Claims Act ("FCA")
### (Retaliatory Termination)

50. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

51. Under Section 3730(h) of the FCA, a plaintiff is protected from retaliation for any "internal" complaint within his employer as to actions that would constitute a violation of the FCA.

52. Defendant in primarily funded by the federal government.

53. During her employment with Defendant, Plaintiff observed and reported to Defendant's management what she reasonably believed to be misuse of federal funds and/or fraud upon the federal government.[1]

54. Plaintiff was abruptly terminated from her employment with Defendant for completely pretextual reasons shortly following her aforesaid complaints and objections to fraud upon the federal government.

55. Plaintiff's termination for protected activities as set forth in this lawsuit constitute violations of the FCA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, awards, training, promotions, reinstatement, and seniority.

B. Plaintiff is to be awarded liquidated, penalty and/or punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

---

[1] A "protected activity" is defined as that activity that reasonably could lead to a viable FCA action. *See McKenzie v. Bellsouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000)(citation omitted). A plaintiff "need not use formal words of 'illegality' or 'fraud." An employee need not have actual knowledge of the FCA for her actions to be considered "protected activity" under § 3730(h). If so, only those with sophisticated legal knowledge would be protected by the statute. *United States ex rel. Yesudian v. Howard Univ.*, 332 U.S. App. D.C. 56, 153 F.3d 731, 741 (D.C. Cir. 1998)(". . . only [lawyers] would know from the outset that what they were investigating could lead to a False Claims Act prosecution.").

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

C. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

D. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

E. Plaintiff is to be given a trial by jury.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____

Ari R. Karpf, Esq.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: September 30, 2021

14

Received County of Berks Prothonotary's Office on 09/30/2021 2:03 PM Prothonotary Docket No. 21-14456

**VERIFICATION**

The undersigned states that the facts in the foregoing Complaint are true and correct to the best of her knowledge, information and belief. The undersigned understands that any intentionally false statements herein are subject to the penalties of 18 Pa. C.S. § 4904 relating to sworn and unsworn statements.

_____
Wanda Brown

Date: ___9/30/2021___